GEO. W. SMITH, Appellant, v. F. W. SHOTLIFF, Respondent.

Springfield Court of Appeals, March 3, 1913.

PARTNERSHIP: Existence of: Burden of Proof as to. The law never presumes the existence of a copartnership but requires those who assert its existence, especially between themselves, to prove its existence by the clearest and most positive evidence. *Held*, that the evidence in this case is not sufficient to show a partnership between the parties thereto.

Appeal from Greene Circuit Court, Division Number One.—*Hon. Guy D. Kirby*, Judge.

AFFIRMED.

*J. A. Sturges, V. O. Coltrane* and *Hugh Dabbs* for appellant.

(1) While the burden of proof is on Smith to prove partnership, it shows that he and Shotliff engaged in a common business for profit which is sufficient and the law only requires this to be proven by preponderance of evidence. 30 Cyc. 403, Div. B; Gatewood v. Bolton, 48 Mo. 78; Miller v. Hale, 96 Mo. App. 427; Clark v. Huffacker, 26 Mo. 264; Brown v. Houchin, 154 Mo. App. 261. (2) The written admis-

sion of Shotliff to Bradstreet is sufficient of itself to prove partnership against him. Kind v. Ham, 4 Mo. 276; Lockridge v. Wilson, 7 Mo. 560; Bates on Partnership, vol. 2, sec. 1154. (3) Shotliff admitted that he signed the Bradstreet credit report stating that Smith was a partner of his in the Shotliff store, the burden of proof therefore is on him to establish that the report was a forgery. Strum v. Boker, 150 U. S. 312; 37 L. Ed. 1093. (4) Shotliff's declaration that he and Smith were not partners was self-serving and was not competent to disprove his written admission and should not have been admitted by the court. Clark v. Huffacker, 26 Mo. 264; Young v. Smith, 25 Mo. 341.

*George Hubbert, M. E. Benton* and *Farrington, Pepperdine & Wear* for respondent.

(1) In the outset appellant was charged with the burden of proving the alleged secret and parol contract of partnership trust, by the clearest and most positive evidence, to the entire satisfaction of the trial court. Gatewood v. Bolton, 48 Mo. 78; McBride v. Ricketts, 67 N. W. (Iowa) 410; Chapin v. Cheery, 147 S. W. 1084; Pomroy v. Benton, 57 Mo. 531; Johnson v. Quarles, 46 Mo. 423; Brinkman v. Sunken, 174 Mo. 709; Moore v. Crawford, 130 U. S. 122; Boon v. Turner, 96 Mo. App. 635; Farley v. Hill, 150 U. S. 572, 37 L. Ed. 1186. (2) The substantial evidence in the case comes from the contesting parties, whose testimony is in irreconcilable conflict, as in the testimony of their respective witnesses. And this court should defer to and affirm the finding of the trial judge who heard and saw them. Jones v. Thomas, 218 Mo. 508; Brecker v. Fillingham, 209 Mo. 583; Tinker v. Kier, 195 Mo. 183; Huffman v. Huffman, 217 Mo. 182; Foster v. Williams, 144 Mo. App. 219; Bigham v. Tinsley, 149 Mo. App. 467; Danforth v. Foster, 158 Mo. App. 94; Jones v. Stever, 154 Mo. App. 640; Linderman v. Carmin, 142 Mo. App. 519. (3) The combined acts and words of

the parties as between themselves, so far as proved by
other persons would not all establish a partnership
under any test of the law, as against Shotliff's sworn
testimony. Ashby v. Shaw, 82 Mo. 76; Howard v.
Jones, 33 Mo. 579; Musser v. Brink, 68 Mo. 242; Min-
gus v. Bank, 136 Mo. App. 407; Glove v. Dawson, 106
Mo. App. 107. (4) Shotliff's declaratory admissions,
if any were made, before or after the alleged contract
of partnership, could not estop him from proving the
truth of the matter as he has done. 30 Cyc. 357; Ab-
bott's Trial Evidence (2 Ed.), ch. 9, art. 4, sec. 47, p.
279; Hughes v. Swing, 162 Mo. 261.

ROBERTSON, P. J.—Plaintiff sued the defend-
ant in the circuit court of McDonald county alleging
that on July 26, 1907, he and the defendant entered in-
to a partnership for the purpose of purchasing a stock
of merchandise and carrying on and conducting a mer-
cantile business in Southwest City in that county, in-
vesting therein $3500, of which plaintiff and defendant
each agreed to contribute one-half; that the partner-
ship agreement was verbal; that the defendant was to
devote his time to the management of the business and
to receive therefor, besides his share of the profits, a
reasonable compensation; that the stock of goods when
this suit was commenced was of the value of $5000
and that the firm owned notes and accounts amounting
to about $2400, and that the defendant shortly before
the commencement of the suit denied all rights of the
plaintiff in and to the business; and the plaintiff
prayed that the partnership be dissolved, a receiver
appointed with power to dispose of the assets of the
partnership and to distribute the proceeds thereof
between the plaintiff and defendant. To this petition
an answer was filed consisting in substance of a gen-
eral denial.

The application for a receiver was taken up before
the judge of the circuit court in which the suit was

instituted and was denied, but for what reason is not shown. A change of venue was then taken to Greene county where the cause was tried on its merits and judgment rendered for the defendant. After an unavailing motion for a new trial, the plaintiff brought the case here. The printed record covers 468 pages. Four hours were consumed in the oral argument of this case in this court, and we have carefully and critically read all of the testimony in the case.

Plaintiff testified that he had lived in Southwest City since 1867; that he was engaged in the mercantile business there from 1883 to 1897, and that for a number of years he had been and was then cashier of a bank at that place; that at the time the negotiations took place, out of which this controversy arose, and for a long time prior thereto the defendant was in the employment of a party by the name of Clark who was conducting a mercantile business in one of the store rooms owned by plaintiff, and that along about the first of July, 1907, the defendant told plaintiff that Clark was offering to dispose of this stock at 25 per cent discount and plaintiff suggested to defendant that he buy it and defendant replied that he was not able; that the plaintiff then suggested to him, after the defendant had another conference with Clark, that it was a good proposition and that he would like to see it continue; that after discussing the proposition again with defendant, plaintiff proposed that if the defendant would take entire charge of the business and attend to the buying and selling and the help, and put in $900 of his own money, that the plaintiff would see that he got the remainder of the money, but that plaintiff didn't want to be known in the business because he was working in the bank which had a line of customers engaged in the mercantile business that would likely take offense if it were known that he was in the same line of business; that the defendant agreed to purchase the stock of goods, and on the following day

Mrs. Clark and plaintiff and defendant and one of the clerks in the store commenced the invoice of the stock, which amounted to something like $4600, and that the plaintiff and defendant then executed and delivered their note for $1700 to the bank of which plaintiff was cashier, and plaintiff contributed his $900 and defendant his $900, making $3500, which was the purchase price paid to Clark for the stock of goods.

The defendant testified that the plaintiff came into the Clark store where defendant was clerking and said to the defendant that he understood that the stock of goods was to be sold and moved to a point in Oklahoma, telling defendant that he owned the building in which the stock of goods was located and the buildings on both sides of it, and that if the stock was taken away that it would leave the buildings vacant and suggested to defendant that he buy the stock; that defendant told him he didn't have the money and that the plaintiff asked how much he had and plaintiff told him a little over $900 and that plaintiff asked what the stock of goods could be bought for and defendant told him seventy-five cents on the invoice price; that plaintiff told defendant he had $900 that he was not using that he would loan him and that he would go on defendant's note at plaintiff's bank for the balance of the purchase price.

This is the testimony of the parties, and all of the testimony as to what the agreement between them was concerning the formation of a partnership, and the remainder of the voluminous record is devoted entirely to an effort on each side to corroborate his contentions or to discredit the contentions of his adversary.

Several years before this controversy and the negotiations which led up to it defendant had married the niece of the plaintiff and plaintiff had taken considerable interest in the welfare of the defendant. The defendant testified at the time the arrangements were being made for the purchase of this stock that he had

offered to have the $900 (which he claimed was loaned to him by plaintiff) included in the note to the bank and to have his wife sign the note or to give the plaintiff a note for the $900 signed by himself and wife.

Shortly before negotiations were commenced for the purchase of the stock of goods Mr. Clark left Southwest City and placed the store in charge of his wife, with whom all negotiations for its sale were had, and the defendant testified that at her request the services of the plaintiff were secured to assist in invoicing, but Mrs. Clark testified that she made no such request and that it was her understanding that the plaintiff was a partner in the business. Plaintiff and one other witness testified that an inventory, in which plaintiff claims to have assisted, was made in the year 1909, but that it was lost; plaintiff claims that the invoice disclosed $6000 net assets, after deducting $700 for the defendant's salary, which it was agreed should be $50 per month. In 1910 an inventory was taken in which plaintiff assisted, which showed $8000 net assets and in 1911 an inventory was taken, in which plaintiff assisted, showing the net assets to be $10,150. Defendant claims he used plaintiff in the invoicing because of his ability in that line.

The inventory of January, 1911, was being taken, by defendant and a son-in-law of the plaintiff, when the defendant claims there was a suggestion made, or he had heard it rumored to the effect, that plaintiff claimed to own an interest in the store and that at that time he suspended the taking of the inventory until the plaintiff, who had been called away to serve on a grand jury, returned; and defendant claims that the plaintiff advised him that since he had been so liberal in his accommodation of the defendant he thought he should have a small interest in the business; but the plaintiff says that about that time the defendant commenced negotiating with him for the purchase of plaintiff's interest in the business. However, at or near that time

the plaintiff and defendant disagreed as to their respective rights and this litigation followed.

Mrs. Clark was a witness for plaintiff and testified that she spoke to the defendant about buying the store and he said he was not able to do so but that he could find a buyer; that she asked him who the buyer was and he said he didn't like to tell because the buyer didn't want to be known in the business, but that the next time she talked with him she said she believed she knew who the buyer was, saying she believed it was the plaintiff and that defendant confirmed her belief. There were two witnesses, however, who testified that subsequent to this time and shortly thereafter, Mrs. Clark stated in their hearing that the defendant was the purchaser of her store; and there were two other witnesses who were formerly customers of Mrs. Clark who testified that she had advised them that she had sold her stock of goods to the defendant, which she does not deny. Two other witnesses testified that defendant told them soon after the purchase of the stock of goods that the plaintiff was a partner or interested in the business.

In August 1907, a representative of a harvester company having learned of the sale of the Clark store went to Southwest City to investigate the standing of the purchaser and in the course of his investigations went to the plaintiff in his bank and made inquiries of him as to the financial standing of defendant, telling him he understood defendant had bought the store, to which the plaintiff replied that he had, and that plaintiff then informed the witness that the defendant had borrowed of the bank $1700 and that plaintiff had loaned him $900 and assured the witness that the defendant was all right and would pay for everything he bought; that the witness further asked the plaintiff if he was behind the business and plaintiff replied that he was not. The plaintiff vigorously assails the credibility of this witness on the assumption that no banker

would so freely disclose the business of its patron, but, as will be shown further along, the plaintiff was the local representative of the Bradstreet reporting agency and it may well be presumed that he felt, on account of his connection with that company and his friendly relations with the defendant, that he could be of greater benefit to defendant by giving a fair and correct report of the defendant's financial condition and urging his worthiness of credit than he could in concealing his true financial condition, thus arousing suspicions and precluding his opportunity to create a favorable impression, by a bare recommendation of the defendant's worthiness of credit.

When the $1700 was borrowed from the bank, the plaintiff gave his check to "Shotliff's Store" for $900, and a deposit slip was made out by plaintiff showing plaintiff's check for $900, defendant's check for $900 and the note for $1700. This deposit was entered upon the ledger of the bank in the account of F. W. Shotliff and shows a credit on that day of $3600 and a debit of $3500, presumably the purchase price of the Clark store, and at the end of the account is a notation: "Transferred to Shotliff's Store, F. W. $100.00, 9.97;" and then in the bank ledger under the heading, "Shotliff's Store, F. W.," appears the entry of the two items of $100 and $9.97. Defendant testified that he knew nothing about what the bank ledger showed.

The testimony also discloses that for a number of years the plaintiff was the local agent of some fire insurance companies and that the plaintiff over his signature as such agent issued a policy covering this stock of goods to ".F. W. Shotliff," the defendant, insuring him against loss from April 29, 1909, for one year to the amount of $500, and another policy dated October 7, 1909, for a like amount for one year, and on October 17, 1910, issued another policy for a like amount for one year; and that on May 4, 1910, he issued one policy for $500 to "F. W. Shotliff of Shot-

liff's Store," and on November 4, 1909, he issued a policy to "F. W. Shotliff's Store" for $500 running for one year; and that on November 4, 1910, he issued another policy to "F. W. Shotliff's Store" for $500 running for one year. Each of these policies contained the provision that it should be void if the interest of the assured in the policy was not truly stated therein; yet he undertakes to explain that situation by saying that if there had been a loss he would have expected a fair settlement, although there is no evidence that he ever advised the insurance companies of the true ownership of the property covered by the policies according to his present contention.

As stated the plaintiff was for several years prior to the time of the trial, since 1883, the local representative of the Bradstreet Company, and a report signed by the plaintiff to that company is urged by plaintiff as conclusive corroboration of his view of the contract with the defendant. Under date of September 16, 1909, a report to that company was made and signed by the defendant in which a detailed statement purports to be given of the financial condition of the business in controversy. It recites that the statement is made by "F. W. Shotliff of the firm of Shotliff's Store," and gives the names of F. W. Shotliff and G. W. Smith as the persons composing the firm. This report was made out on a printed blank sent to the defendant by the Bradstreet Company. Under the item, "To banks for borrowed money" figures were written and following the item, "To others for borrowed money" appears the word "None." This report is signed "Shotliff's Store, F. W. S."

Defendant Shotliff denies that he wrote or authorized the writing of all of the information contained in this report and especially denies that he wrote in the name "G. W. Smith" and denies that he wrote the word "None" after the words, "To others for borrowed money."

There was some expert testimony introduced on the trial on the question of the handwriting in these items, some of the witnesses testifying that in their opinion it was defendant's handwriting and others testifying in their opinion it was not. The plaintiff himself testified that he had known the defendant's handwriting for eight or nine years by seeing his checks on his bank and by seeing his writing in various ways and that he had seen him write, but when this report was submitted to him and he was asked whose handwriting it was, including the signature, he replied: "Mr. Shotliff's, especially the signature, and I think it is all his. He is peculiar about his writing. He writes a good many different hands." The assistant cashier of the plaintiff's bank testified at the trial and he says that he first heard of Mr. Smith's claiming an interest in the store about the first of the year 1911; he stated he was familiar with defendant's handwriting and when asked as to the writing of some designated portions of the report he stated that it might have been put there by some one else, and that he could not say positively that the name of plaintiff there was not written by plaintiff. This witness also testified that there was a difference in the colors of the inks that were used to write this report.

We now come to a discussion of that portion of the testimony which it is claimed in behalf of the plaintiff wholly discredits the defendant and justifies the conclusion that none of the defendant's testimony should be believed. Defendant contended that he had partially filled out this blank report when the plaintiff came into the store and that defendant requested him to finish it, which the plaintiff undertook to do; that the plaintiff sat down at the desk and defendant went to another part of the store; and other witnesses testify that after the plaintiff had written at the desk a few minutes he got up and went out of the store, taking the report with him, and in leaving he dropped a paper

which attracted the attention of these witnesses; that when the defendant returned the witnesses called his attention to the paper which plaintiff had dropped and that defendant picked it up and put it away. This paper which was dropped by plaintiff and picked up by defendant was lost sight of by defendant, as he claims, until after this controversy arose and that then he became very anxious as to its whereabouts. Defendant testified that by reason of ill health he one day fainted and fell near his home and was carried home partially unconscious and that upon regaining consciousness, in some unaccountable way, it occurred to him where this paper was placed by him and that he wrote a note to some one at the store telling him where to find the paper and that it was found and taken to defendant at his home. This paper purported to be a partial synopsis of the report to the Bradstreet Company but differs from the said report in that this paper does not designate the plaintiff as a member of the firm and this paper shows borrowed ''From friends, $900.00.'' Defendant here contends that this was a partial report made out by him from which he was making up the report to send to Bradstreet's which was given to plaintiff to complete. Plaintiff admits that he may have taken the report and mailed it to Bradstreet. Pages of the record are taken up in the direct and cross-examination of the defendant on the theory that he claims to have discovered this paper by reason of a dream, and considerable effort is displayed in behalf of plaintiff to discredit the defendant on account of such contention and a great deal of learning and labor is displayed on behalf of defendant to uphold the verity of dreams; but as a matter of fact on an examination of the record it is apparent that until the defendant was driven and led to that theory he had no such notion of the proposition but that by reason of some operation of his mind, inexplainable by him by any other term than a dream, he was enabled to recall where the paper had been

placed. When he was hard pressed for a designation of the peculiar mental phenomenon, occurring as he claims it did immediately upon his regaining consciousness, he could, no doubt, in the excitement of the trial and when being hard pressed by one of superior ability, think of no better name for it than a dream. His first reference to it was as follows: "I don't know whether it was a dream or not, it came to me where I had put this statement." And from there on the ridicule proceeded without any suggestion of a better term to apply to that peculiar action of the mind that enables one to suddenly recollect dormant ideas or forgotten information. Even if his term was inaccurate, we think his idea of the operation of his mind is accurate and he should not be condemned as a perjurer on so flimsy an accusation.

It is suggested in behalf of the plaintiff that it is absurd to presume that plaintiff, a successful banker and business man, would loan the defendant $900 without interest or a memorandum, and would act as security for the $1700, but a sufficient answer to that is that his own conduct relative to the alleged partnership business is as absurd. He made no memorandum whatever of the alleged partnership agreement between him and defendant and he testifies that he never had openly acknowledged the partnership until September, 1909, when it was apparent that the defendant had by his own individual efforts demonstrated his ability to make a success of the business. Plaintiff, according to his own admissions, as the local agent for insurance companies wrote insurance upon this stock of goods wherein he designated the defendant as the sole owner and issued policies which required the true ownership to be stated therein, and he did not, so far as the testimony disclosed, ever advise the insurance companies, for which he was acting, of the true ownership as he now contends it was. He further admits that while he did not want it to be known that he was a partner in

the business, because of his desire to not create any antagonism against the bank on account of his being engaged in the mercantile business, it was not disclosed to his associate in the bank until 1911 that he claimed an interest in this store.

According to plaintiff's contention the partnership between him and defendant had existed for nearly four years prior to the time the controversy involved here arose. During all of that time the plaintiff was the local representative of a credit reporting agency and as such it was evidently his duty to give full financial reports on all persons or firms doing business in that town. It is a well known fact that such financial statements give the character of the parties conducting the business, the names of the parties, and if a partnership the financial standing of each partner, as well as the financial condition and assets of the firm. In the latter part of 1909 the plaintiff did report that the Shotliff Store was a copartnership composed of himself and the defendant as partners. None of the previous reports were produced in evidence and may have been lost or destroyed, but no doubt if any such report had been made some evidence of that fact could have been obtained. Suffice it to say, however, that when this particular report was sent in the agency took a lively interest in the information and proceeded immediately to verify the truthfulness of its statements, so that it is apparent that this was the first time the fact of plaintiff's alleged connection with the business was ever disclosed to his principal in this reporting business.

It was also disclosed and not denied that the defendant procured from the store all of the groceries and supplies for his family, consisting of a wife and two children, without in any way accounting for or charging himself with the same, and that his wife at one time conducted a boarding house for the use and maintenance of which goods were taken in the same man-

er from the store, but nowhere does it appear that the plaintiff ever made any complaint on this account. No salary account was kept with defendant and nothing to show how much or when he was paid. The best excuse for this offered by the plaintiff was that an allowance was made and deducted from the assets shown by the annual inventories.

The last utterance of our Supreme Court to which we have been directed is to the effect that "the law never presumes the existence of a copartnership but requires those who assert its existence, especially between themselves, to prove its existence by the clearest and most positive evidence." [Chapin v. Cherry, 147 S. W. 1084.]

We do not find it necessary in this case to invoke the rule that this court will in equity cases defer largely to the finding of the trial court on account of its superior advantages in seeing and observing the witnesses, because after a thorough consideration of the testimony, and giving the plaintiff the benefit of all inferences in his behalf, on his own testimony and that of his witnesses, we are of the opinion that the plaintiff fell far short of the rule laid down in the Chapin case, *supra.* It follows that the judgment of the trial court should be affirmed, which is accordingly done. *Sturgis, J.,* concurs. *Farrington, J.,* not sitting.